Yenni v. The Ocean National Bank of the City of New York.

FREDERIC A. YENNI *against* THE OCEAN NATIONAL BANK OF
THE CITY OF NEW YORK.

The defendant made advances to one S. on a pretended warehouse receipt for
goods which were in reality held and owned by him, and the goods were sub-
sequently levied on under an execution against S. After the levy had been
made, the defendant, in ignorance of the fact that the warehouse receipt was
fraudulent, and that the levy had been made, authorized S. to sell the goods
and turn over the proceeds to it. S. accordingly sold the goods to the plaint-
iffs, who were the purchasers in good faith, and they, on learning of the levy,
applied to the defendant's president, who, being still ignorant that the ware-
house receipt was fraudulent, informed them that S. had authority from the de-
fendant to sell the goods, and that they had a good title to them as against the
sheriff under the levy. The plaintiffs thereupon commenced a suit against the
sheriff, in which they were defeated. S. applied the proceeds of the sale to his
own use, but the amount advanced to him by the defendant on the warehouse
receipt was subsequently repaid: *Held,* that the defendant was not liable to
the plaintiffs as an undisclosed principal for the failure of title to the goods,
nor for the costs of the suit brought against the sheriff.

APPEAL from a judgment of this court entered on the de-
cision of a judge thereof after a trial before him without a jury.

The action was brought against the defendant to charge it
as the undisclosed principal on a sale of goods by the Ster-
ling Oil Works to the plaintiffs' firm of Yenni & Gregory, the
title to the said goods having failed. The judge found, as mat-
ters of fact, that previous to December 15th, 1866, Edward S.
Stokes had been for some time the owner and manager of
a manufacturing establishment situate at Greenpoint, Kings
County, in the State of New York, called "The Sterling Oil
Works," and acted as such owner and manager. That on De-
cember 15th, 1866, he applied to defendants, and obtained a
loan from them of $5,000 on his own note, upon the pledge, as
collateral security therefor, of a paper purporting to be a ware-
house receipt, in these words: "Sterling Oil Works, Green-
point, Brooklyn, December 6th, 1866. Received on storage
for account of Edward S. Stokes, six hundred barrels of petro-
leum, crude and refined, contained in tanks, and seven hundred

barrels to hold the same, deliverable on his order, on payment of the charges named thereon, in accordance with the marginal note hereto. (Signed) William H. Chapman, Superintendent. (Endorsed) Edward S. Stokes."

That said Chapman was the mere agent or employee of said Stokes, and no such property as that specified in said receipt had ever been warehoused or placed on storage in charge of any third person, nor was there any corporation or other parties than said Edward S. Stokes engaged in business under the said name of The Sterling Oil Works, but such was the name which said Stokes used in carrying on the business of dealing in and refining petroleum oil at said works on his own account. That he had previously made an ostensible transfer of the said Sterling Oil Works to his mother, but as before, continued to control and transact the business thereof; and such transfer was made in anticipation of the recovery of judgments against him, and with intent to hinder and delay his creditors.

That prior to said 15th day of December, 1866, the defendant had frequent dealings with said Stokes, in loaning him money on collateral security of papers purporting to be warehouse receipts of The Sterling Oil Works, and under faith of the same being *bona fide* warehouse receipts of some third party for petroleum oil, or property actually held by such third party on storage for him, and without knowledge that The Sterling Oil Works was a name under which he carried on business. That the aforesaid paper purporting to be a warehouse receipt, upon which the aforesaid loan of $5,000 was procured by said Stokes from the defendant, was false and fraudulent, and made or procured to be made by him, with intent to defraud the defendants in procuring such loan from them, and they were so deceived and defrauded, and induced to make such loan on the faith of said pretended warehouse receipt, as the genuine warehouse receipt of some third party having on store said 600 barrels of petroleum and 700 barrels on store for him, as was purported by the terms of said receipt, and were deceived and defrauded into making said loan to him, on the faith of the genuineness of said paper, as an actual and *bona fide*

warehouse receipt. That at the time of the making of the aforesaid loan of $5,000 by the defendant to said Stokes, there was in said Sterling Oil Works a quantity of about 600 barrels of petroleum in bulk or in tanks, owned or controlled by said Edward S. Stokes, also a quantity of empty barrels. That subsequently, and on or about the 22d day of December, 1866, the sheriff of the county of Kings, by virtue of two executions issued on said judgments recovered against said Stokes by the Oneida County Bank, levied on all the said oil and barrels in said works, as his property. That at the time of the making of said loan by the defendant to said Edward S. Stokes, on his representation that he might find favorable opportunity for the sale of said petroleum oil, David R. Martin, the president of defendant's bank, stated to him he might do so, accounting for the proceeds to defendant, and subsequently said Stokes, through a broker, contracted with the plaintiffs for the sale of 150 barrels of said petroleum oil by memorandum of sale dated January 8, 1867, and stating that there had been " sold for account of Sterling Oil Works, to Messrs. Yenni & Gregory, Maiden Lane, one hundred and fifty barrels of refined petroleum. Terms cash, on delivery of gauger's return and lighter's receipt for the oil." Which memorandum was signed " Sterling Oil Works, E. S. Stokes, agent ; R. H. Little, broker."

That on the 14th day of January, 1867, under and in pursuance of said memorandum or contract of sale, one hundred and sixty-six (instead of 150) barrels of petroleum oil were delivered the plaintiffs by said Stokes, and plaintiffs thereupon paid said Stokes by check, designating him as agent, the sum of $3,296$\frac{70}{100}$ therefor, and he applied the same to his own use. That at the time of said purchase, and until after such payment, plaintiffs had not been informed or notified of any actual or assumed agency of said Stokes, for or on behalf of the defendants in the sale of said petroleum to them, nor had they in the making of such purchase, or payment of the agreed price, any intimation that the defendants were undisclosed principals therein, or any ground for relying upon them in that capacity or relation. That subsequently, and on or about the 16th day of January, 1867, the sheriff of the county of Kings, by virtue

of the aforesaid levy upon said petroleum and barrels, made under said executions issued to him in December previous, on said judgments of the Oneida County Bank, seized and took away from the possession of the plaintiffs one hundred and twenty-three barrels of said petroleum, so as aforesaid sold and delivered them by said Edward S. Stokes. That shortly after such seizure, the plaintiffs applied to said David R. Martin, president of defendant's bank, at the bank, in relation to such transaction, who thereupon stated to them that their title to said petroleum oil was good; that the bank had advanced the money on the oil upon said warehouse receipt; that he had given Stokes authority to sell the oil, and that the sheriff of Kings had no right to seize it; and being yet ignorant of the deceit practiced on them by said Stokes, made and delivered the paper writing as follows: "Ocean National Bank, of the City of New York. January —, 1867. E. S. Stokes: Dear Sir,—You may dispose of the 166 bbls. of oil and empty casks you have reported sold for our ac., and will send ac. sales and check for amount to me. Yours, &c., D. R. Martin, Pres'd't," but refused to aid in the bringing of a suit by plaintiffs, by giving the necessary bonds to replevin the property. That on the fourth of February following, plaintiffs commenced an action in the Supreme Court, of claim and delivery of possession, of which defendant had notice, for the recovery against said sheriff, as possessor of said 123 barrels of petroleum, which was defended by said sheriff, and resulted in a judgment in favor of said sheriff, against said plaintiffs for the value thereof, and costs, the sum of $2,487 $\frac{77}{100}$, which, on appeal to the general term, was affirmed for the sum of $3,221 $\frac{79}{100}$, and again on further appeal to the Court of Appeals, was again affirmed by that court, and the plaintiffs, by reason of the failure of the title to the said 123 barrels of oil so sold them as aforesaid, sustained damages, including costs of defending said action, and the interest to the day of trial, in the sum of $4,774 $\frac{62}{100}$.

That the amount of the loan of $5,000, so as aforesaid made by the defendant to said Edward S. Stokes, upon the security of said warehouse receipt, was repaid them as follows, to wit: $2,500 on the 31st day of January, 1867, by a discount of a

note of his mother, and the balance on the eighteenth day of March, 1867, when said warehouse receipt was returned to him.

The judge (ROBINSON, J.) concluded as matter of law :

*First.* That the authority verbally given by the defendants to Edward S. Stokes, on the making to him of the loan of $5,000, to sell the petroleum oil referred to in said paper purporting to be a warehouse receipt, constituted but a waiver or relaxation by the pledgees to the pledgor of their rights of lien, and that he might deal therewith as owner, subject only to an accounting to them for the proceeds to the extent of their lien.

*Second.* That in the sale made by said Stokes to plaintiffs in the name of The Sterling Oil Works, he, and not the defendants, was the principal in the transaction, and the defendants were not the vendors to plaintiffs of said oil.

*Third.* That by the acts of the defendants aforesaid, they in no way, either by representation or otherwise, made themselves the undisclosed or actual principals in the aforesaid sale of said petroleum to plaintiffs, nor are the plaintiffs entitled to any recourse to them for any of their aforesaid losses.

Judgment was accordingly ordered for the defendants, and plaintiffs appealed.

*Joshua M. Van Cott* (*Edwin A. Doolittle* with him), for appellants.

*F. N. Bangs*, for respondent.

DALY, Chief Justice.—The finding of facts excepted to : 1. That Chapman was the agent and employee of Stokes. 2. That The Sterling Oil Works was simply a name used by Stokes, that no other person but Stokes carried on the business under that name, and that no such property as that specified in the receipt had ever been warehoused or placed on storage in charge of any third person—*that is*, that it was in charge of Stokes himself, being in charge of his superintendent Chapman. 3. That he had previously made a transfer of the business to his mother, with the intent to hinder and delay his creditors. 4. That the

warehouse receipt was fraudulent, and made by him with an intent to deceive the defendants in procuring the loan, and that they made the loan on the faith of its being a genuine receipt of some third party having the quantity of oil and barrels on store for him, as the terms of the receipt purported. 5. That the defendants, ignorant of the fraud practiced upon them, made and delivered the written order of the president of the bank, authorizing Stokes to sell. 6. That Stokes applied the money received by him from the plaintiffs to his own use, are all fully sustained by the evidence, and our judgment will proceed upon the conclusion that the facts of the case are as found by the judge.

I am unable to see how upon the facts found by the judge, the bank can be held answerable for the loss which the plaintiffs incurred by the purchase of the property from Stokes. The complaint in substance, avers that the bank through their agents and servants, claimed to be the owner and holder of the property; that they offered it for sale through their authorized agents for and on their behalf, as their property; that the plaintiffs, *relying upon such representation and statements*, purchased it; that upon Stokes producing the gauger's return and the lighterman's receipt, the plaintiffs, for the purpose of ascertaining the true owner of the property and the authority of Stokes to sell it, demanded the evidence of his authority; upon which he stated that the oil was the property of the bank; that he acted as its authorized agent, and that he delivered to the plaintiffs an instrument signed by the president of the bank, authorizing him to sell it for the bank, upon which the plaintiffs paid him the purchase money and received the property.

The complaint then avers that the property having been taken from them by the sheriff, as property which had been levied upon by him previously to the sale of it to the plaintiffs, under an execution upon a judgment recovered against Stokes, they notified the defendants of what had occurred, and requested them to defend and protect the plaintiffs' title; that the defendants then asserted that they were at the time of the sale, the *bona fide* owners and holders of the property, and that the plaintiffs had acquired a valid title to it, by the sale of it to

them ; that they, the defendants, required the plaintiffs to assert and maintain their title to it in law, and that the plaintiffs, at the *special instance and request of the defendants*, brought an action of replevin against the sheriff for wrongfully taking it, in which action a verdict was rendered in favor of the sheriff.   That the plaintiffs thereupon requested the defendants to pay the damages they had sustained by reason of the failure of the title, which the defendants refused, and the plaintiffs then at the instance of the defendants, upon the defendants' belief *and at their request*, appealed to the Court of Appeals where the judgment of the court below was affirmed, and the plaintiffs were compelled to pay the judgment and the costs of the appeal.

The plaintiffs failed to prove this state of facts.   They did not show that the oil was offered for sale to them as the property of the defendants, and that they purchased it relying upon any such representation or statement ; but, on the contrary, the written memorandum of sale shows that it was sold to them on account of the Sterling Oil Works, and that the memorandum was signed by Stokes with the affix of *agent ;* that is, agent of the Sterling Oil Works—the Sterling Oil Works being, in fact, Stokes himself.   And they did not prove that the action of replevin was brought at the defendants' request, or that the appeal to the Court of Appeals was upon the defendants' behalf, and at their request.

It may be assumed that the bank acquired any title which Stokes had to the property, by the indorsement to them of the petitioners' warehouse receipt.   That both he and Chapman would be estopped as against the bank from setting up that the receipt was fictitious, and not based upon a real transaction, and that this estoppel would be equally effectual against all claimants under Stokes, upon a title subsequently acquired. That although it was not—as the Court of Appeals held when this transaction was before them, upon the appeal from the judgment—a warehouse receipt within the meaning of our statute, it was an instrument, the indorsement of which with an intention to transfer the property, would by the law merchant transfer it independent of the statute.   That as between Stokes

and the bank, it was a mortgage, which was void as against Stokes' creditors, as there had been no immediate delivery of the property under it, or change of possession, and the mortgage had never been filed. All this, I say, may be assumed; but it in no way helps the plaintiffs' case.

In the very able argument of this case on the part of the appellants, it was claimed that the bank put in motion the agencies which resulted in the sale to the plaintiffs, and the loss of the money which they paid for the oil. This was not the fact. The bank, under the impression that they held a regular warehouse receipt, authorized Stokes to sell the oil, upon his informing them that it was declining in value in the market. But he did not assume to act under this authority. He could have done all that he did if no such authority had been given. He sold it, not as the property of the defendants, but as purporting to be the property of the Sterling Oil Works, and delivered it himself, the pretended warehouseman Chapman being his superintendent and servant. When he made the sale, he knew what the defendants did not, that the property was then levied upon under an execution against him. With this knowledge, he went to the works, carried it away, and delivered it to the plaintiffs, receiving from them the purchase money, part of which he gave to his mother, the pretended owner of the oil works, and the residue he applied to his own use. He testified that he told the broker, when he employed him, that he had authority *from the bank* to sell the oil; but this statement is inconsistent with the written memorandum of the sale, and is in conflict with the testimony of the broker, who says, that he did not tell him until the oil was sold, upon whose account he sold it. There is no finding by the judge upon this point; but we must assume, so far as that may be necessary in support of his judgment, that he relied upon the memorandum and the testimony of the broker. Stokes, in fact, perpetrated a fraud upon the plaintiffs, by selling and delivering to them property to which he knew that neither he nor the defendants had then any claim, it having been levied upon by the sheriff, as he had previously perpetrated a fraud

upon the defendants, by borrowing $5,000 of them upon the security of a fictitious warehouse receipt.

The president of the bank testified that it was his impression that he gave Stokes a verbal authority to sell, when the bank loaned him the $5,000, which was on the 10th of December. The sale by Stokes to the plaintiffs was on the 8th of January following. The giving of this verbal authority in no way affected the sale made to the plaintiffs. They were in no way influenced or misled by it in making the purchase, and as respects them or the broker, Stokes, as I have already said, could have done all that he did without any such authority. After the sale was made, Stokes procured from the president a written authority. The precise time when he procured it does not appear. The instrument is simply dated January, 1867. All that the president could say was that he gave Stokes a verbal authority when the $5,000 was loaned to him, and that he came subsequently and the president gave him a written order. Stokes testified that he got the written authority after the oil was sold; that he did not know whether he got it before the plaintiffs gave him their check or not. And in answer to a direct inquiry, said that he did not recollect whether or not he got it after the sheriff of Kings county had gone to the plaintiffs and claimed the property. That the plaintiffs up to that time knew nothing about this written authority appears by the testimony of one of them, Willard Gregory, who says that he did not know who Stokes was acting as agent for when the sheriff came and took the property from them, and that he did not receive or see the written authority until after that seizure; so that, up to this time, the plaintiffs knew nothing of any interest which the defendants had in the oil, or of the authority given by them to Stokes to sell it. There was nothing in that circumstance, therefore, that induced or led to the purchase.

I think it very plainly appears when and why this written authority was obtained. There is first the suspicious circumstance that the date is given generally in January, the day of the month being omitted. Stokes was asked if anything was said at the time the order was given about omitting the day,

and he answered, " Not a word ; " but when afterwards asked
if it was not unusual for men of business to give orders with-
out dating them, he replied that he thought that something was
said about putting January, because the oil had been sold a day
or two previous.   It appears by the complaint, that the sheriff
of Kings county took the oil from the plaintiffs on the 17th of
January, nine days after the plaintiffs bought it.   Now Stokes
had previously testified that when he applied for the written
authority, he told the president that he was sorry the *way
things was ;* that some of the oil had been taken out of the
works ; that he had intended the proceeds to go to him, but
*they had gone to another channel ;* that he was *sorry about it,*
but that his mother would pay the deficiency, and that the
president told him if he would do that, it would be satisfactory,
to which he answered that he would sell *the oil* and *account*
for it, and that the president replied, " All right ; do so." Now
by his own showing, he had then sold the oil, and the written
authority in fact, so states.   He told the president that some
of the oil had been taken from the works.   This was true.   He
had taken 168 barrels himself, and delivered them to the
plaintiffs.   He also told the president that he had intended the
proceeds (that is, of what had been taken away) to go to him,
but they had gone to another channel.   What was this other
channel ?   Evidently the taking of the 168 barrels by the
sheriff from the persons to whom he had sold them, the plaint-
iffs, showing very plainly, to my mind, that it was after this
event that he went for the written authority.   There was a
reason for it then, at least in his mind, which did not exist be-
fore.   It had been sold to the plaintiffs, and as he had a verbal
authority from the president, he had nothing to do but to go
to the bank and give him the check he had received from the
plaintiffs upon the sale of it, which he did not do, but divided
the purchase money between himself and his mother.   But the
sale had proved abortive.   The sheriff had followed the prop-
erty and recaptured it.   Willard Gregory, one of the plaintiffs,
says that when the oil was seized, he went immediately to the
broker, found out where Stokes' office was, went there and
found Stokes at his lawyer's.   It was after this that the written

authority was produced and given to the plaintiffs, for Willard Gregory swears they received it *immediately* after the seizure by the sheriff, and that his impression was that he first saw it in their lawyers' office, Van Cott, Winslow & Van Cott.

The president of the bank, in the various interviews between him, the plaintiffs and their lawyers, did not request the plaintiffs to bring the replevin suit, or to appeal to the Court of Appeals. When Willard and George Gregory called at the bank, after the seizure, they saw the secretary, and told him of what had occurred. He told them that the bank had advanced money on the oil, and had a warehouse receipt for security, and that he did not see how the sheriff could hold it. They then saw the president. He made the same reply in substance as the secretary, saying, in addition, that the plaintiffs' title to the oil was good, that he had directed Stokes to sell it, and gave him authority to do so. They asked him what he thought they had better do, and he replied that their title was good, and that they had better defend it. At another interview he referred to the receipt, and said that if that was not a good warehouse receipt, there could not be one ; that they were doing business in that way every day ; that if they could not be protected on that, that it was time the bank should know it. When called upon in respect to the appeal to the Court of Appeals, he was told that the case was decided against the plaintiffs, and the plaintiffs said that they thought he ought to relieve them from the suit and furnish sureties to carry the case to the Court of Appeals, to which his answer was that they had got a good title to the goods, and that he would not do anything about it.

There was nothing in this evidence, and it is all that there is, showing that the bank authorized or requested the plaintiffs to bring the replevin suit or the subsequent appeal. What the president said was said in ignorance of the fact that that warehouse receipt was fictitious. He supposed that the bank held a regular warehouse receipt, duly indorsed ; and under that impression, stated that the title of the plaintiff was good, as the bank had given Stokes authority to sell. In this he was mistaken ; but the mischief was then done. The plaintiffs had

bought the property, paid for it, and the sheriff had then taken it out of their possession. The president's mistaken confidence in the validity of the bank's title may have induced the plaintiffs to bring the action of replevin, but that is no ground for holding the bank answerable for the loss which the plaintiffs sustained by purchasing and paying for the goods. Nor does it affect the question that Stokes' mother afterwards paid the $5,000 to the bank which Stokes had borrowed. That the bank has escaped from loss is no reason why they should make good the plaintiffs' loss, both parties being equally innocent.

This is not the case of a principal who is liable for the frauds of his agent, acting within the scope of his authority, for that liability is founded upon the principal's holding out his agent as fit to be trusted, and who thereby, in effect, warrants his fidelity and good conduct (Story on Agency, 7th ed. §§ 127 and note, 443, and 445 ; 4 Bac. Abm. Master and Servant, K) ; but here the defendants did not hold out Stokes to the plaintiffs as their agent, nor did the plaintiffs purchase the property with any such understanding or impression. Nor can the defendants be brought within the rule which charges an undisclosed principal upon a contract made by the agent in his own name. That rule is founded upon the justice of holding the undisclosed principal responsible, although the agent made the contract in his own name, or generally as agent, without specifying his principal, because the contract was made by the principal's direction and for his benefit. But that rule is never enforced for the advantage of a third party, if it would work injustice to the principal. As the third party contracted with the agent in his own name, or generally as an agent, without any knowledge of the principal, he has no right to look to the principal, if the principal, without any default upon his part, would then be prejudiced by being made personally liable. The rule is subject to the correlative rights existing, as between the principal and his agent, and will not be enforced against the principal where it would be inequitable and unjust to do so (*Thompson* v. *Davenport*, 9 Barn. & Cres. 78 ; 1 Bell's Com. § 418, 4th ed. ; Smith on Mercantile Law, 126, 127, 3d ed. ; Story on Agency, § 449, 7th ed.)

Such is the case here. All the right which the defendants ever had to this property was such as Stokes conferred by indorsing to them the fictitious warehouse receipt, and they had none whatever when Stokes sold it to the plaintiffs, it having then been levied upon by the sheriff. The levy was made on the 22d of December, and the sale to the plaintiffs on the 8th of January following by Stokes, was evidently to evade and defeat the levy; a circumstance of which the defendant was ignorant. That Stokes did not then make the sale for the defendant's benefit appears in the fact that he made it as the assumed agent of The Sterling Oil Works, of which he was the proprietor and not the agent, and from the disposition which he made of the proceeds. To hold the defendant, therefore, answerable for the loss which the plaintiffs sustained in buying from Stokes, as the assumed agent of The Sterling Oil Works, a quantity of oil to which neither he nor the defendant had then any claim or title, a fact of which the defendant was ignorant, would be unjust, and which the plaintiffs have no right to insist upon to the defendant's prejudice, where Stokes did not assume to act by virtue of the oral authority they gave him to sell, but where he sold it, and the plaintiffs bought it of him, as the supposed agent of The Sterling Oil Works. The defendant gave him authority to sell; but between the time when that authority was given and the sale, a circumstance occurred which divested the defendant of any right or claim to the property; a circumstance of which they were ignorant, but of which Stokes had knowledge. It was not a sale, therefore, made by their authority, for it cannot be assumed that they authorized him to sell it after it had been levied upon (*South-ern* v. *How*, Cro. Jac. 469, 470. *See the third proposition, which the court adopted*). If the defendant had held out Stokes to the plaintiffs as their agent, it might have been otherwise; but they cannot be held answerable, under such circumstances, as the undisclosed principals. The judgment should be affirmed.

J. F. DALY and LOEW, JJ., concurred

Judgment affirmed.